**UNITED STATES of America, Appellee,**

**v.**

**Edward Hume PASCHALL and William Albert Ricker, Appellants.**

**No. 84–5166.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 11, 1985.

Decided Aug. 30, 1985.

Harold K. Bennett, Asheville, N.C. (Bennett, Kelly & Cagle, P.A., Asheville, N.C., on brief), for appellants.

Kenneth P. Andresen, Chief Asst. U.S. Atty., Charlotte, N.C. (Charles R. Brewer, U.S. Atty., Asheville, N.C., on brief), for appellee.

Before RUSSELL and CHAPMAN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge:

The defendants were convicted of two violations of the Hobbs Act, 18 U.S.C.A. § 1951, when they were employees of the North Carolina Department of Transportation. Count 1 charged them with having accepted for themselves and their wives, an expense-free weekend vacation at Hilton Head Island, occupying a villa owned by a highway contractor. The indictment charged that the benefit was received under color of official right. A hunting vacation in Texas provided by another highway contractor was the subject of the second count. There was a third count charging Paschall with having received a six months old 1980 Cadillac automobile as a gift from a highway contractor. Paschall claimed, however, that he purchased that automobile for cash, paid in three installments, and, though he had no receipts, the jury was unable to agree upon a verdict. The third count was later dismissed.

On their appeals from their convictions, the principal contention of the defendants is that they were passive recipients of gratuities, and that neither had sought the benefits nor misused his office. It is contended, in effect, that a coercive demand that the benefit be given or actual misconduct in office, other than receipt of the benefit, is an essential element of any Hobbs Act offense.

We disagree and affirm the convictions.

## I.

In the late 1970's the North Carolina Department of Transportation was engaged in the construction of a new highway from Weaverville to Marshall. The project was divided into three sections designated Parts A, B and C. Part B was let in November 1978 to Asheville Contracting Company whose president was Baxter Taylor. Part C was let in March 1979 to Phillips & Jordan, Inc. of Knoxville, Tennessee and Robbinsville, North Carolina.

The defendant, Paschall, was the Department's resident engineer charged with immediate supervision of the work on behalf of the Department. The defendant, Ricker, was the Chief Inspector under Paschall on Part B, though his only work on Part C is said to have been concerned with the construction of a bridge with which Phillips & Jordan had no involvement.

The testimony showed, indeed the defendants admitted, that they and their wives were flown on a Friday from Asheville, North Carolina to Hilton Head Island, South Carolina in a company plane owned by Asheville Contracting Company and were returned in the company plane to Asheville on the following Monday. While at Hilton Head, they occupied a villa upon which the name of Baxter Taylor was displayed and which was owned either by him or by Asheville Contracting.

The defendants supplied a gloss to this. They said that on their own they had planned a golfing weekend at Sea Pines Plantation on Hilton Head, and that somehow Mr. Taylor learned of it and insisted they use the company plane which was already scheduled to make a round trip from Asheville to Hilton Head on both Friday and Monday. He also offered them the use of his villa if the four visitors would clean it up in preparation for Taylor's own use of it beginning on Monday and if they would see that an automobile that Taylor kept at the Hilton Head airport

was operational. They found that the transmission of the automobile was frozen until they added transmission fluid, and they cleaned up the villa.

There was also testimony that the villa rented for $750 a week.

According to Paschall, he received an invitation from Phillips & Jordan to go on a hunting excursion to Texas, and to bring two other state employees with him. He testified that he had first declined but accepted when told that their going would not cost Phillips & Jordan anything since they had already planned to fly some of their own people down. Paschall and Ricker were flown on a corporate plane from Asheville to Knoxville, where they were transferred to a much larger plane and, with representatives of Phillips & Jordan, were flown to Texas. They were housed in a lodge, and Phillips & Jordan provided food, drink, hunting equipment, guns and ammunition.

Rather oddly, Ricker testified that in neither instance did he know who his benefactor was until he saw Mr. Taylor's name at the villa on Hilton Head and until he recognized some of Phillips & Jordan's people in Knoxville. He had not thought to inquire of his friend Paschall.

While the indictment and, largely, the trial thus focused on the two excursions to Hilton Head and to Texas, there was evidence of other trips at the expense of Asheville Contracting and Phillips & Jordan. There was testimony that the excursion to Hilton Head, using Taylor's villa, was an annual event, and there were trips to such things as football games, entirely at the expense of the contractors.

For the benefit of the jury, the prosecutor offered testimony of the motivation of Phillips & Jordan in extending such favors. A representative from that company testified at some length that state engineers and inspectors were required to interpret and enforce specifications of the contract. Things could go smoothly for the contractor when the responsible state official was reasonable and fair, but he could create difficulties when his interpretations of the requirements were rigid and technical. Moreover, the computation of periodic payments was based upon the estimates of such people, and low estimates resulting in underpayment in early phases of the project could create financial difficulties for the contractor. For such reasons, they felt in need of the goodwill of such people and the maintenance of friendly relations with them. Phillips & Jordan were new to highway construction work in North Carolina and were fearful that they might encounter unfair treatment.

II.

The Hobbs Act proscribes robbery or extortion which obstructs, delays or affects commerce or the movement of any article in commerce. It defines the term extortion to mean "the obtaining of property from another, with his consent, induced by the wrongful use of actual or threatened force, violence, or fear, or under color of official right."

The meaning of "induced ... under color of official right" is the question in this case.

■ It has been held that inducement by a public official, in the sense that he overtly solicited the payment, is not an essential element of the offense. *United States v. Hedman*, 630 F.2d 1184, 1995 (7th Cir. 1980); *United States v. Jannotti*, 673 F.2d 578, 595 (3rd Cir.1982). Nor is it necessary for the government to prove as a part of its case that the public official misused his office in the sense that he granted some benefit or advantage to his benefactor to which the benefactor was not entitled. *United States v. Trotta*, 525 F.2d 1096, 1100 (2d Cir.1975); *United States v. Scacchetti*, 668 F.2d 643, 648 (2d Cir.1982); *United States v. Kuta*, 518 F.2d 947, 950 (7th Cir.1975). It is enough that the benefactor transfers something of significant value to the public official with the expectation that the public official will extend to him some benefit or refrain from some harmful action, and the public official accepts the thing of significant value know-

ing that it is being transferred to him because of his office.

The jury in this case was instructed consistently with that principle. The district court emphasized that the thing must be of significant value, which the jury must have understood to mean to be of such value as to be calculated to influence the official's conduct. If the thing was of significant value, the jury was told that it might convict if it found that it was paid and received with the expectation on the part of the payer that it would influence the public official's conduct and with the knowledge on the part of the public official that it was paid to him with that expectation.

### III.

The primary contention on appeal is that the instructions were erroneous. The contention is that the defendants "passively" received proffered free trips without ever having affirmatively sought them, and that the contractors had not received from them any advantage to which the contractors were not entitled. In short, they contend that, in order to make out a violation of the statute, the payment must have been made at the behest of the public official, or the public official abused his office in the sense that he granted some advantage to the payer to which the payer was not entitled.

It is true, indeed, that in some of the cases holding that inducement is not an essential element of the offense, there was a misuse of the public office in the sense that that term is used by the appellants, while in some of the cases holding that misuse of the public office is not an essential element of the offense the payment was invited by the public official.

The senses in which the appellants use the relevant terms, however, are simply too narrow.

That there must be inducement springs directly from the statutory definition of extortion, but "induced ... under color of official right" should not be artificially construed to mean that the public official must have demanded or suggested it. When the public official invites the payment, it is, of course, inducement, but some public offices, by their very nature, provide the inducement. Most purchasing agents need not extend an open palm to receive suggestions of a willingness to pay kickbacks. Supervising highway engineers, exercising broad discretionary authority over highway construction firms, invite proffers of favors to which they are not entitled unless the public official or his superiors lay down clearly enunciated ground rules so that the construction firms understand that nothing may be gained by offers of such favors and that the making of such offers may disadvantage them.

There was explicit testimony in this case about the motivation of Phillips & Jordan. Such work in North Carolina was new to them, and they were apprehensive about the treatment they would receive at the hands of the state's supervisors. Overly rigid, overly technical construction of a contract and its specifications can result in the rejection of work when acceptance is the only reasonable thing and when redoing the work will effect no improvement of any moment. Compliance with the requirements of an unreasonable and hypertechnical resident engineer can be very costly to the construction firms. Moreover, as the witness pointed out, periodic payments were based upon estimates by the resident engineer. If the engineer is unfair to them in making early estimates, they are deprived of the use of money which, in good conscience, they should have received, but which they will not receive until the project is completed or is nearing completion. That, too, can be very costly to contractors.

There was testimony that the North Carolina Department of Transportation had a policy against acceptance by its officials of gifts from persons contracting with the Department but that the policy was widely disregarded until 1981 when the Department advised all contractors to forbear. There was testimony, of course, of previous acceptance of gifts by these defendants, but receptivity to such favors on the part of some Department engineers can create an impression of general receptivity

on the part of all of them. Whether or not the jury was persuaded that these two trips were not the first or only expense paid trips accepted by these defendants, in the climate of the late 1970's, their official positions were, in themselves, invitations to seek their goodwill by extending to them substantial favors which were not their due.

■ Misuse of office inheres in the acceptance of gifts. No public official, indeed no agent, should accept from others things of value for performing the duty he owes to his employer or his principal. If the state-employed highway engineer receives money from a construction firm for fairly performing his supervisory duty, he owes it to the state. In the long run, contractors, such as these construction firms, will factor into their bids the cost to them of obtaining fair performance by the public officials of their public duty.

■ The prosecution undertook to show that Paschall did extend some advantages to the contractors to which they were not entitled. We cannot know to what extent, if at all, the jury believed that he did, but the government proved misuse of his office when it proved that he accepted things of value from the contractors to which he was not entitled and which he knew were given him with the expectation of influencing his conduct of his public office, even if the contractor sought no more than reasonable and fair performance of the defendant's supervisory function.

## IV.

■ The controlling principle in this circuit was stated in *United States v. Barber*, 668 F.2d 778 (4th Cir.) *cert. denied*, 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982), quoting from *United States v. Hedman*, 630 F.2d 1184, 1194–95, n. 4 (7th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981);

"The provision has been interpreted so as 'not [to] require proof of specific acts by the public officials demonstrating force, threats, or the use of fear so long as the victim consented [to the provision of a benefit] because of the office or position held by the official who obtained the money.'

'If the public official knows the motivation of the victim focuses on the public official's office and money is obtained by the public official which was not lawfully due and owing to him or the office he represented, that is sufficient to satisfy the requirements of the law of extortion under color of official right.' "

*See also United States v. Price*, 617 F.2d 455, 457–58 (7th Cir.1979); *United States v. Braasch*, 505 F.2d 139, 151 (7th Cir. 1974).

In *Barber*, it is true that the defendant both sought the payment of money to him and manipulated the state's liquor withdrawal rules so that liquor withdrawn by him for his own use and that of his friends and associates would be treated by distillers as having been withdrawn by them and for which the distillers would reimburse the state. There was both solicitation of benefits he received and gross misuse of the office. The decision, however, did not turn on those facts. As the court observed at 668 F.2d 784,

"When the 'donee' is the state's alcoholic beverage chief, the conclusion is irresistible that, absent a convincing explanation, the 'gift' was not a gift, but, rather, was in return for favors or for the withholding of punitive measures. No such convincing explanation has been forthcoming here. Its absence provides an adequate basis for an inference that a true gift was not the purpose of the liquor companies, and that, as far as the liquor companies were concerned, there was nothing voluntary about the withdrawals."

■ When the public regulator "passively" receives and retains gifts of substantial value from the regulated, he has subverted his office and one may readily infer that the inducement of the gift was the public official's office and not a benevolent friendship.

There is contrary authority in the Court of Appeals for the Second Circuit. *United States v. O'Grady,* 742 F.2d 682 (2d Cir. 1984) (*en banc*); *United States v. Campo,* 744 F.2d 944 (2d Cir.1984).

O'Grady was superintendent of the Quality Control Section of New Car Engineering, of the New York City Transit Authority at a time when the Authority was acquiring 745 new subway cars. Over a period of years, he accepted from contractors on the work "all-events season tickets" to Madison Square Garden, some forty-three trips to expensive pleasure resorts and other entertainment and lesser gifts. The value of the season tickets and the pleasure trips was said to have exceeded $34,000. O'Grady was convicted under the Hobbs Act, but a majority of the *en banc* Court of Appeals reversed the conviction. It found no evidence of inducement, unless inducement was to be inferred from the long course of conduct, and the case had not been tried on that theory. The majority expressed its concern that under the trial court's instructions, a public official might have been found guilty of a violation of the Hobbs Act for accepting some gift of trivial value, such as a hotdog. The conviction was reversed and the case remanded for a new trial during which, according to a majority of the judges, the jury might infer inducement from O'Grady's long course of conduct in accepting favors.

█ In this case, the jury was instructed that they might convict only if they found that the gifts were of "significant" value, so we are not confronted with the specter that seems to have haunted the majority of the judges on the Court of Appeals for the Second Circuit that the acceptance of trivial favors might constitute a violation of the Hobbs Act.

█ Nor are we persuaded that when the public official does not solicit the benefit, inducement may be inferred only from a long course of conduct on his part. As we have seen, there are circumstances under which the office itself provides the inducement, and inducement was sufficiently established here when the jury, properly instructed, found that the benefits were extended because of the defendants' offices and that the defendants accepted the benefits knowing the motives of their benefactors.

█ Nor does the decision of the Second Circuit in *O'Grady* affect our conclusion that the jury properly found that the defendants had misused their offices. Though the contractors may have gotten no more than their due in the performance and execution of the contract, as the defendants claim, the defendants' receipt of payment from the contractors for the performance of acts they were firmly obligated to the state faithfully to perform, is a misuse of office. When a public official accepts a payment for an implicit promise of fair treatment, there is an inherent threat that, without the payment, the public official would exercise his broad discretionary authority in a harassing or oppressive manner. After all, Judge Manton, who accepted bribes to assure that certain pending cases would be decided in certain ways, was not permitted to defend on the ground that the cases were correctly decided. *United States v. Manton,* 107 F.2d 834 (2d Cir.1939). That the decisions would have been the same had there been no taint of bribery is irrelevant, for when Judge Manton accepted large sums of money from litigants to perform his judicial duty he gravely misused his office; indeed, he prostituted it.

█ A public official's retention of things of value paid to him by private persons for performance of his official duty is a misuse of his office.

### V.

The defendants complain of several evidentiary rulings, but we find no merit in their contentions. Since the jury was properly instructed, we affirm the convictions.

AFFIRMED.