**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert L. McCORMICK,**
**Defendant–Appellant.**

No. 88–5702.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 6, 1989.

Decided Feb. 12, 1990.

Rehearing and Rehearing In Banc
Denied March 7, 1990.

---

Rebecca Ann Baitty (Rudolph L. DiTrapano, DiTrapano & Jackson, Charleston, W.Va., on brief), for defendant-appellant.

Michael Warren Carey, U.S. Atty. (Nancy C. Hill, Larry R. Ellis, Asst. U.S. Attys., Jacquelyn I. Custer, Sp. Asst. U.S. Atty., Charleston, W.Va., on brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, CHAPMAN, Circuit Judge, and WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.

ERVIN, Chief Judge:

Robert L. McCormick appeals his conviction for extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951, and for filing false income tax returns in violation of 26 U.S.C. § 7206(1). On appeal, McCormick asserts that the payments he received were campaign contributions and that, therefore, the evidence did not support the jury's verdict. He further contends that the government's references to alleged violations of state campaign reporting laws and to his receipt of benefits from a lobbyist denied him a fair trial. For the reasons discussed below, we affirm the judgments of conviction of the defendant.

I.

McCormick is a member of the West Virginia House of Delegates representing an economically depressed, coal mining region of West Virginia which has long suffered from a shortage of medical person-nel. To help alleviate this problem, he has been a leading advocate of legislation to allow foreign medical school graduates to practice in underserved areas of the state without meeting full licensing requirements.

For the past twenty years, foreign medical school graduates who had not met the state medical licensing requirements have been allowed to practice medicine under a "temporary permit" while studying further for the state licensing exams. Some of these persons had been taking and failing the exams for a number of years. During this time they were developing considerable on-the-job experience, and their services were needed in areas of the state such as McCormick's district.

In the 1980s there was a strong movement in the House of Delegates to end this "temporary permit" option. Fearing that this movement jeopardized their careers, several of the temporarily licensed doctors organized themselves, incorporated their group under the name "Coalfield Health Care Association" ("the Association"), and hired a lobbyist, John Vandergrift, to represent them in the state capital. Dr. Ernesto Manual was the leader of this group. In the 1984 West Virginia legislature, the Association and Vandergrift worked for legislation extending the temporary permitting procedures one more year. McCormick sponsored the House version of this proposed legislation which passed on the last day of the regular session of the legislature. Shortly thereafter, Vandergrift discussed with McCormick additional legislation, to be introduced during the 1985 session, providing a permanent solution to the doctors' problem by granting them a permanent medical license as a result of their years of experience. McCormick agreed to sponsor the 1985 legislation.

During his 1984 reelection campaign, McCormick communicated to Vandergrift that his campaign was expensive, that he had not "heard from" the doctors, and that he wanted Vandergrift to contact them. Vandergrift contacted Dr. Manual, and on the morning of June 1, 1984, Vandergrift received from Manual an envelope with

nine one-hundred dollar bills which he delivered to McCormick at his business office. McCormick's receipt of this money constituted basis for the extortion charge on which he was convicted. The government's evidence also showed that a second delivery of two thousand dollars in cash was made that same afternoon. McCormick neither reported these payments as campaign contributions on the required reporting statements nor listed them on his income tax return.[1] After June 1, McCormick dealt directly with the doctors and received three more cash payments, on November 1, November 12, and December 19, 1984.

In the spring of 1985, McCormick sponsored H.B. 1431, which allowed experienced physicians to be permanently licensed without attaining the minimum passing score on the licensing exams. He spoke at length in favor of the bill during floor debate. The bill was passed by both houses of the legislature and signed into law by the Governor. According to the Government's evidence, on May 15, 1985, two weeks after H.B. 1431 became law, McCormick received the last cash payment from Manual.

For each of these payments, Manual wrote a check on the Association account payable to "Cash," cashed the check, and then placed the cash in envelopes which were personally delivered to McCormick's business office. Although Manual maintained detailed books of the Association's expenditures, the only written records indicating the purpose of these checks were initials or other codes signifying that the funds were for McCormick. Furthermore, McCormick never reported these payments as campaign contributions nor accounted for them in his campaign's bookkeeping records.

In September 1988, a federal grand jury returned a six-count indictment against McCormick. The first five counts charged that McCormick had violated the Hobbs Act, 18 U.S.C. § 1951, by extorting the payments under color of official right. The final count charged him with filing a false income tax return, in violation of 26 U.S.C. § 7206(1), by failing to report as income the payments he received in 1984. At the close of the six-day jury trial, the jury convicted McCormick of the first count of extortion and of the income tax violation, but it could not agree on verdicts on the remaining counts and the trial court declared a mistrial on them. McCormick was fined $50,000, plus $900 restitution and costs, plus three years suspended sentence and probation. He appealed his convictions to this court.

## II.

McCormick argues that his conviction under the Hobbs Act is not supported by sufficient evidence. He claims that the payments were campaign contributions and not illegal payoffs because there was no coercion or *quid pro quo* exchange for the payments.

The Hobbs Act proscribes extortion, defined, for the purposes here pertinent, as obtaining property from another, with his consent, "induced ... under color of official right." The provision has been interpreted so as

> not [to] require proof of specific acts by the public officials demonstrating force, threats, or the use of fear so long as the victim consented [to the provision of a benefit] because of the office or position held by the official who obtained the money.

> If the public official knows the motivation of the victim focuses on the public official's office and money is obtained by the public official which was not lawfully due and owing to him or the office he represented, that is sufficient to satisfy the requirements of the law of extortion under color of official right.

> The mere voluntary payment of money would not constitute extortion.

*United States v. Barber,* 668 F.2d 778, 783 (4th Cir.), *cert. denied,* 459 U.S. 829, 103

---

**1.** West Virginia state election laws prohibit cash campaign contributions in excess of $50 per person. W.Va.Code § 3–8–5d (1987).

S.Ct. 66, 74 L.Ed.2d 67 (1982) (quoting *United States v. Hedman,* 630 F.2d 1184, 1194–95 n. 4 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981)); *see also United States v. Paschall,* 772 F.2d 68, 71 (4th Cir.1985), *cert. denied,* 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986). In *Barber,* this court also noted:

> The line is a fine one between an altogether "voluntary" payment and the conferring of a benefit on someone who holds a particular public office in fear of retaliation or in expectation of benefit.... [I]f read literally, the [language of the Hobbs Act] could arguably prohibit a public official from personally soliciting a campaign contribution.

*Barber,* 668 F.2d at 783.

This case revolves primarily around the question of whether the money McCormick received was the result of extortion or only an illegal campaign contribution. If the payments were "induced under color of official right" and paid to preserve McCormick's support of H.B. 1431, then the money violated the Hobbs Act. On the other hand, financial contributions in support of candidates are a legitimate and integral part of the democratic process today in America. *See Buckley v. Valeo,* 424 U.S. 1, 21, 96 S.Ct. 612, 635, 46 L.Ed.2d 659 (1976). If the money was a voluntary campaign contribution, then McCormick is guilty only of violating state election laws.

Although we acknowledge that the facts in this case present a fine distinction, we hold that there was substantial evidence, viewed in the light most favorable to the government, for the jury to conclude that the first payment was extorted in violation of the Hobbs Act. *See, e.g., United States v. Suthard,* 820 F.2d 662, 663 (4th Cir. 1987); *Evington v. Forbes,* 742 F.2d 834, 835 (4th Cir.1984) (standard of review of jury verdicts).

### A.

In cases involving non-elected officials receiving benefits, this court has held that it is not "necessary for the government to prove as a part of its case that the public official misused his office in the sense that he granted some benefit or advantage to his benefactor to which the benefactor was not entitled." *United States v. Paschall,* 772 F.2d 68, 71 (4th Cir.1985), *cert. denied,* 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986) (North Carolina Department of Transportation officials receiving free trips to Hilton Head and Texas); *see also United States v. Spitler,* 800 F.2d 1267, 1274 (4th Cir.1986) (Maryland State Highway Administration official receiving handguns, rifles, and jewelry). "A public official's retention of things of value paid to him by private persons for performance of his official duty is a misuse of his office." *Paschall,* 772 F.2d at 74.

However, the receipt of voluntary campaign contributions by elected representatives should not, of course, constitute a violation of the Hobbs Act. The difficulty lies in articulating a standard to distinguish such campaign contributions to elected representatives from monies extorted because of the official's position. In *United States v. Dozier,* 672 F.2d 531 (5th Cir.), *cert. denied,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982), the Fifth Circuit upheld the Hobbs Act conviction of an elected state agriculture commissioner who solicited campaign contributions and other money—ranging up to $200,000—through explicit promises or threats concerning his future official acts. Dozier unsuccessfully argued that the Hobbs Act is unconstitutionally vague as applied to elected officials soliciting legitimate political contributions. Although acknowledging the "reasonableness of these apprehensions," the court upheld the application of the Hobbs Act to elected officials:

> A moment's reflection should enable one to distinguish, at least in the abstract, a legitimate solicitation from the exaction of a fee for a benefit conferred or an injury withheld. Whether described familiarly as a payoff or with the Latinate precision of *quid pro quo,* the prohibited exchange is the same: a public official may not demand payment as inducement

for the promise to perform (or not to perform) an official act.

*Id.* at 537.

In many cases, Courts of Appeals have upheld Hobbs Act convictions of elected officials that involved *quid pro quo* exchanges. *See, e.g., United States v. Cerilli*, 603 F.2d 415 (3d Cir.1979) (equipment leases), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980); *United States v. Wright*, 588 F.2d 31 (2d Cir.) (school book purchases), *cert. denied*, 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979); *United States v. Mazzei*, 521 F.2d 639 (3d Cir.) (rental property leases), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975). These cases, however, do not stand for the proposition that such exchanges are *required* for a conviction under the Hobbs Act.

The Second Circuit has explicitly held that a *quid pro quo exchange* is not required for political contributions to constitute a violation of the Hobbs Act. In *United States v. Trotta*, 525 F.2d 1096 (2d Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), the indictment alleged that a Commissioner of Public Works demanded and induced payments in political contributions to the local Republican Committee from an engineering firm. The court on appeal held that the indictment did *not* have to allege a specifically identifiable misuse of office by the official on behalf of the payor in return for the payment of money. *Id.* at 1100. It recognized that such a *quid pro quo* may be present in an extortion, but as long as the use of official power is the basis for the extortion, then it is not an essential element of the crime.

■ We agree with the Second Circuit that alleged "political contributions" may violate the Hobbs Act in more than one way. When there are specific promises given or threatened actions withheld in exchange for political contributions, such as in *Dozier*, this *quid pro quo* exchange is persuasive evidence that the money was extorted in violation of the Hobbs Act. But in addition, if payments to elected officials are not treated as legitimate campaign contributions by either the payor or the official, then a jury may reasonably infer that these payments are also induced by the official's office in violation of the Hobbs Act. Otherwise, unless there was an explicit *quid pro quo* promise, elected officials could avoid the Hobbs Act merely by calling the money "campaign contributions." In this situation, the actual intent of the parties is the key determining factor.

■ In *Paschall* and *Spitler*, this court did not require the government to prove that the non-elected official granted some benefit or advantage in exchange for the money paid to him. Elected officials should be held to standards at least as high as non-elected officials. Therefore, we now hold that the circumstances surrounding money given to elected officials may be sufficient, without proof of an explicit *quid pro quo* exchange, to prove that the payments were never intended to be legitimate campaign contributions. Receiving such payments violates the Hobbs Act. Some of the circumstances that should be considered in making this determination include, but are not limited to, (1) whether the money was recorded by the payor as a campaign contribution, (2) whether the money was recorded and reported by the official as a campaign contribution, (3) whether the payment was in cash, (4) whether it was delivered to the official personally or to his campaign, (5) whether the official acted in his official capacity at or near the time of the payment for the benefit of the payor or supported legislation that would benefit the payor, (6) whether the official had supported similar legislation before the time of the payment, and (7) whether the official had directly or indirectly solicited the payor individually for the payment.

■ Violations of state election laws, while an appropriate consideration in characterizing the payments, do not create *per se* violations of the Hobbs Act. Careless reporting of otherwise legitimate political contributions should not subject elected officials to prosecution for this serious federal offense, and prosecutors should exercise caution to avoid arbitrary and selective

prosecution of elected representatives. But when an official does not intend a payment to be a campaign contribution, a jury should be allowed to infer from the circumstances surrounding the payment that it is in fact a payoff violating the Hobbs Act.

### B.

■ Under the facts of the present case, Dr. Manual's payments to McCormick do not appear to be legitimate campaign contributions. McCormick, Vandergrift, and Dr. Manual all knew that cash campaign contributions greater than fifty dollars were illegal in West Virginia. Nevertheless, the payments were made with one hundred dollar bills placed in sealed envelopes and delivered to McCormick personally at his office. The payments were not reported on McCormick's campaign financial statements, nor were they recorded in the Association's books as campaign contributions. Although McCormick had supported in the past the foreign-educated doctors practicing with a temporary permit in his district, his continued support was essential in order for them to receive a permanent license. Knowing this, he told their lobbyist that he had not "heard from" the doctors.

Under these facts, a reasonable jury could find that McCormick was extorting money from the doctors for his continued support of the 1985 legislation. Further, the evidence supports the conclusion that the money was never intended by any of the parties to be a campaign contribution. Therefore, we refuse to reverse the jury's verdict against McCormick for violating the Hobbs Act.

### III.

■ The jury also found that McCormick had failed to report the money received from Dr. Manual in 1984 on his federal income tax returns in violation of 26 U.S.C. § 7206(1). McCormick's only defense to this charge was that the money was not personal income but rather was a contribution to his reelection campaign. Revenue Ruling 71–449, 1971–2, C.B. 77. The fact, however, that the jury convicted McCormick of violating the Hobbs Act under these facts implicitly indicates that it rejected his attempts to characterize at least the initial payment as a campaign contribution. Therefore, the jury found the funds were personal income, and this court affirms McCormick's conviction on this count also.

### IV.

■ McCormick also contends that the government's evidence and arguments regarding his alleged violations of state campaign laws and Vandergrift's payment of some of his expenses during the 1985 legislative session deprived him of a fair trial. As explained above, evidence of reporting or not reporting payments received by an elected official is a relevant consideration to determine whether the payments are or are not campaign contributions. Therefore, this evidence was admissable and did not deprive McCormick of a fair trial.

■ Last, evidence concerning Vandergrift's payment of some of McCormick's expenses may be of uncertain relevance, but, again, admission of this evidence certainly did not deprive McCormick of a fair trial.

### V.

There was sufficient evidence to support the jury's verdict, and the convictions of McCormick are

AFFIRMED.