UNITED STATES of America,
Plaintiff–Appellee,

v.

Anthony Thomas TORCASIO,
Defendant–Appellant.

No. 91–5316.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 6, 1991.

Decided March 11, 1992.

Martha Purcell Rogers, Cadwalader, Wickersham & Taft, Washington, D.C., argued (Ronald G. White, on brief), for defendant-appellant.

John Patrick Rowley, III, Asst. U.S. Atty., Charleston, W. Va., argued (Michael W. Carey, U.S. Atty., Michael L. Keller, Asst. U.S. Atty., on brief), for plaintiff-appellee.

Before SPROUSE and LUTTIG, Circuit Judges, and BUTZNER, Senior Circuit Judge.

OPINION

PER CURIAM:

Anthony Torcasio was indicted for paying $17,000 to a West Virginia state senator for the purpose of influencing the passage of a statute that would legalize gambling in the state. After a four-day trial, Torcasio was convicted of aiding and abetting West Virginia Senate President Daniel Tonkovich, who earlier pleaded guilty to committing extortion in violation of the Hobbs Act. 18 U.S.C. § 1951.[1] Torcasio was also convicted of one count of perjury for lying to a grand jury, in violation of 18 U.S.C. § 1623. The district court sentenced Torcasio to thirty-six months in prison, to a twenty-four month concurrent sentence for the perjury violation, and fined him $5000. On appeal Torcasio raises issues pertaining to sufficiency of evidence, exclusion and inclusion of evidence, jury instructions, and the sentence. We affirm on all issues but remand for resentencing.

I

During its winter session of 1986, the West Virginia Legislature was scheduled to consider whether the state should legalize gambling. Prior to that, in 1985, Torcasio, who had worked in New Jersey's legalized gambling business for years, began advising a small group of investors who hoped to operate a gambling casino in Weirton, West Virginia. Also prior to the legislative session, in November 1985, Tonkovich met with the same investors to discuss the economic benefits of legalized gambling. Then, in December 1985, at a similar meeting of investors, Tonkovich and Torcasio met for the first time. Fred Perone, one of the investors, inquired whether Tonkovich, who owned a small public relations firm,

would be interested in mounting a public relations campaign directed to increase public interest in legalized gambling; Tonkovich declined. According to Tonkovich, after the meeting Torcasio tried to give him a cash campaign contribution which he refused. Torcasio, however, denied at trial the attempt to give Tonkovich money.

A month later, at another meeting of the investors attended by Tonkovich, a second public relations firm presented a proposal to perform services for the would-be gambling organization. Tonkovich testified that after the meeting, Torcasio asked to speak to Tonkovich in private. According to Tonkovich's testimony, Torcasio complained that the services proposed by the other firm were too expensive and asked Tonkovich to be the investor's in-state business consultant. Tonkovich testified that they agreed on a $15,000 contract which Tonkovich suggested be put in the name of Robert Cain, Tonkovich's administrative assistant. Torcasio denies that this encounter occurred, and two witnesses corroborated his testimony that he left immediately after the business meeting.

Tonkovich testified that, as a result of the agreement with Torcasio, he then drafted a handwritten contract. The contract was given to Robert D'Anniballe, the investors' attorney, who, after changing some of its provisions, returned a typed contract to Tonkovich. The final version called for three $5,000 payments in exchange for public relations work done from February through March of 1986. All three payments were made to Cain by D'Anniballe in February; Cain transferred $11,400 to Tonkovich, retaining $3,600 to pay the income tax due because the checks had been made payable to him.

---

**1.** The Hobbs Act, codified at 18 U.S.C. § 1951, states, in pertinent part:

  (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

  (b) As used in this section— ...

    (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

Torcasio was charged under 18 U.S.C. § 2(a) which provides in part that

  [w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

Tonkovich also testified that in February 1986, Torcasio gave him $1,000 in cash for his newborn son. Tonkovich also claimed at trial that in May 1986, Torcasio gave him an additional $1,000 in cash as a Mother's Day gift for his wife. Torcasio denies making both payments. In June 1986, Tonkovich became apprehensive when *The Charleston Gazette* published articles which questioned his outside business activities and raised the issue of extortion. Consequently, he returned the $1,000 Mother's Day gift by a check which was never cashed and was returned to him. He also returned, through Cain, the $15,000.

## II

■ Torcasio argues that the evidence was insufficient to establish that he paid money with the expectation that he would receive some benefit from Tonkovich, as required by the Hobbs Act. *See United States v. Paschall,* 772 F.2d 68, 71–72 (4th Cir.1985), *cert. denied,* 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986). He emphasizes the evidence that tends to prove that the contract was legitimate. There was, of course, evidence to that effect, but the task of resolving conflicting testimony and the permissible inferences flowing from such evidence belong to the factfinder. We review the evidence in the light most favorable to the government. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Sherman,* 421 F.2d 198, 199 (4th Cir.), *cert. denied,* 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970). Applying this standard, we are persuaded that there was sufficient evidence from which a reasonable juror could conclude that Torcasio either arranged to pay or paid Tonkovich with the expectation of obtaining favorable action in the senate vote on legalized gambling.

■ Likewise, we find no merit to Torcasio's contention that the recent Supreme Court decision in *McCormick v. United States,* —— U.S. ——, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991), requires the government to prove here a specific *quid pro quo.* We do not think *McCormick* went so far. In fact, the Court in *McCormick* considered only campaign contributions, expressly declining to decide whether its ruling applied to any other kind of payments. *See McCormick,* —— U.S. at ——, n. 10, 111 S.Ct. at 1817, n. 10. In reaching its conclusion, the Court relied on the relation between political campaign contributions and a realistic assessment of the political process that makes campaign funds necessary and legitimate. *See McCormick,* —— U.S. at ——, 111 S.Ct. at 1817. As the Supreme Court indicated, imposing the *quid pro quo* requirement in the area of campaign contributions balances the interest in public integrity with the practical demands of democracy and avoids criminalizing legitimate behavior.[2] In contrast, this case does not involve an effort to finance Tonkovich's future political campaigns. It simply involves investors in a gambling enterprise who were trying to have gambling legalized in a state where it was illegal.

■ Similarly, we find no error in the district court's rulings on three evidentiary issues. With regard to these rulings, Torcasio first argues that the court erred in refusing to admit a statement which Fred Perone made to New Jersey gaming enforcement officials. Perone, who owned a New Jersey gambling license, was inter-

---

**2.** The Court in *McCormick,* of course, did not exempt campaign contributions from the Hobbs Act; the Court stated that it is possible for an elected public official to commit extortion in the course of financing an election campaign. *McCormick,* —— U.S. at ——, 111 S.Ct. at 1877. The Court held that, when the payments to an official are campaign contributions, the government must prove that the money was given in return for an explicit promise to perform or not to perform an official act. *Id.* Specifically, it said that such payment is

vulnerable under the Act as having been taken under color of official right, but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking. This is the receipt of money by an elected official under color of official right within the meaning of the Hobbs Act.

*Id.*

viewed by New Jersey agents in connection with possible wrongdoing in West Virginia. He told the investigators that he had paid $15,000 to Tonkovich—one of the payments at issue in Torcasio's trial—to do public relations work for the investors' potential casino. Although the statement was hearsay, Torcasio argued that it fell within the hearsay exception for statements against interest. *See* Federal Rule of Evidence 804(b)(3). The district court disagreed, finding the statement was not against Perone's penal interest because the admission that he had hired Tonkovich to do public relations work could not have resulted in any adverse consequence to Perone. We find no abuse of discretion in this conclusion of the district court.

Torcasio next argues that the district court committed error by refusing to admit the grand jury testimony of Fred Perone and his brother and fellow investor, Ralph Perone. They had testified that the investors decided to hire Tonkovich's firm and authorized the investors' lawyer to pay for the firm's services. At a hearing on the government's motion *in limine* the court indicated it would exclude the grand jury testimony because "the hearing has indicated no basis for the admissibility of the grand jury testimony." Although the court left open the possibility of admitting the testimony during trial, the defense did not raise the issue again. After reviewing the circumstances surrounding both of these exclusions, we are not persuaded that the district court abused its discretion in either instance.

■ Torcasio also claims that the district court erred by denying his motion *in limine* to suppress his own grand jury testimony because he was unrepresented by counsel and was neither informed that he was a target of the grand jury investigation nor advised on the record of his constitutional rights. Although the better practice, of course, would have been for the prosecutor to specifically advise Torcasio of his rights on the record, we find no abuse of discretion in the court's ruling that Torcasio had received adequate notice of his Fifth Amendment rights because they were outlined in material enclosed with Torcasio's grand jury subpoena.

■ We next consider Torcasio's contentions of error regarding two of the trial court's instructions to the jury. He first attacks the district court's instruction that it was not necessary for the government to have proved that Tonkovich overtly solicited the payments. He concedes that while this circuit recognizes the Hobbs Act's requirement of proof of inducement, we have held that the government need not show that the public official overtly solicited the payment. *See United States v. Paschall, supra* at 71. He urges, however, that *Paschall* be overruled. Even were we so inclined, that course of action "lies beyond our province as a panel of this court...." *Caldwell v. Ogden Sea Transport, Inc.,* 618 F.2d 1037, 1041 (4th Cir.1980); *see also North Carolina Utilities Commission v. Federal Communications Commission,* 552 F.2d 1036, 1044, n. 8 (4th Cir.), *cert. denied,* 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977).

■ Torcasio also complains that the district court erred in not instructing the jury that they must unanimously agree that Torcasio made at least one of the three payments. The court's complete charge to the jury included instructions that, "[I]n order to return a verdict, it is necessary that each juror agree to it. Your verdict then must be unanimous." The court also subsequently instructed the jury to "[b]ear in mind that you are not to reveal to anyone, not even the court, how you stand numerically or otherwise on the guilt or innocence of the accused until you have reached a unanimous verdict." Torcasio argues that because the indictment and the complexity of the evidence could create uncertainty and confusion regarding the factual basis for the conviction, the district court erred by not instructing the jury that it was necessary to reach a unanimous verdict on at least one of the three discrete payments.

Torcasio did not offer such an instruction at trial nor did he object to the court's failure to give such an instruction. He contends, however, on appeal that the dis-

trict court committed plain error. It is true that circumstances in many trials require specific unanimity instructions, *see United States v. North,* 910 F.2d 843, 876 (D.C.Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991) (in case involving multiple false statement charges jury must be given special unanimity instruction), and *United States v. Payseno,* 782 F.2d 832, 837 (9th Cir.1986) (to convict on extortion charge where separate victims, times, and locations involved, special unanimity charge required). In our view, however, such special circumstances were not present here. The multiple acts alleged are based on an ongoing set of dealings between two individuals, Torcasio and Tonkovich, and practically all of the convicting evidence was given by one of the participants, Tonkovich. There was little, if any, chance of jury confusion, and we are not persuaded that the failure to give an additional unanimity instruction relating to each of the payments was clear error.

■ Although we affirm the judgment, it is necessary, in view of our recent decision in *United States v. Dunnigan,* 944 F.2d 178 (4th Cir.1991), to remand to the district court for resentencing. In *Dunnigan,* decided after Torcasio's trial, we held that an upward adjustment for testimonial denial of guilt under Guideline § 3C1.1 of the United States Sentencing Guidelines is unconstitutional. *Dunnigan,* 944 F.2d at 185.

We, therefore, remand with instructions to the district court to reduce Torcasio's Guideline offense level by two points and to resentence based on that offense level determination. The government at resentencing will not be permitted to seek alternative enhancement.[3]

In view of the above, the judgment of conviction is affirmed, but the case is remanded for resentencing.

3. On appeal, the government argued that on remand it should be allowed to seek an enhancement for obstruction of justice for subornation of perjury. The government claims that Torcasio may have induced his trial witnesses to

CONVICTION AFFIRMED; REMANDED FOR RESENTENCING.

perjure themselves or committed other acts giving rise to further enhancement. We reject that suggestion. This remand is for the limited purpose of reducing the offense level and resentencing.