UNITED STATES of America, Appellee,

v.

Clifford BRANTLEY, Appellant.

UNITED STATES of America, Appellee,

v.

Henry E. INGRAM, Jr., Appellant.

UNITED STATES of America, Appellee,

v.

Clifford BRANTLEY and Henry E. Ingram, Jr., Appellants.

Nos. 84–5233, 84–5234 and 84–6674.

United States Court of Appeals, Fourth Circuit.

Argued March 5, 1985.

Decided Nov. 7, 1985.

Robert B. Wallace, Charleston, S.C., Glenn B. Hester (Paul E. Tinkler, Wallace & Wallace, Charleston, S.C., J. Robert Cooper, Law Offices of J. Robert Cooper, Atlanta, Ga., on brief) for appellant.

John McIntosh, Asst. U.S. Atty., Columbia, S.C. (Dale L. Dutremble, Asst. U.S. Atty., Henry Dargan McMaster, U.S. Atty., Columbia, S.C., John R. McCravy, III, Third Year Law Student on brief) for appellee.

Before HALL and MURNAGHAN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge:

The defendants were convicted of extortion in violation of the Hobbs Act, and of conspiracy to commit extortion in violation of that statute. Since the only claimed actual effect upon interstate commerce was pretensive activity by FBI agents, we reverse the convictions of the substantive offenses but affirm the convictions on the conspiracy count.

### I.

An FBI agent named Domine was sent from Cleveland, Ohio to investigate, in an undercover capacity, a report of corruption on the part of a state magistrate on Hilton Head Island, South Carolina. He pretended to be interested in opening and operating a gambling den, for which he would need some protection from law enforcement officials. He met the defendant Ingram who, among other things, owned and placed gambling devices known as poker machines. They discussed the possibility of Domine renting a vacant restaurant on Hilton Head Island and of insulating an illegal gambling operation from intrusion by law enforcement officials. It turned out that the vacant restaurant was unavailable on a short term basis, but Ingram, who had grown up in Jasper County, South Carolina and sometimes dabbled in real estate, told Domine of a vacant restaurant in Hardeeville, Jasper County, South Carolina, which he thought appropriate for Domine's purpose. Brantley, the sheriff of Jasper County, was a friend of Ingram's, and Ingram assured Domine that Brantley would protect the illegal gambling operation if paid $500 a month. Ingram also suggested that Domine give Brantley $200 during the first meeting to demonstrate his good intentions about later payments.

Domine and Ingram visited Brantley in his office in Ridgeland, the county seat of rural Jasper County. Domine explained his intention to rent the restaurant building and, once a month, bring in people from such cities as Cleveland, New York and Chicago for gambling at very high stakes. Brantley expressed approval of the proposal, though he insisted that local people not be involved. At the conclusion of the meeting, Ingram gave the sheriff $200 which Domine had provided for that purpose.

Domine rented the building on a monthly basis. Gambling tables and equipment were brought down from the FBI training academy in Quantico, Virginia and installed in the club. Thereafter, once a month for the next four months, six to eight FBI agents were assembled at the club. They gambled, but with money supplied by the FBI. They consumed alcoholic beverages that had been provided by the FBI, and they "paid" for their drinks with money furnished by the FBI.*

In each of those four months, Domine met with Sheriff Brantley. He told the sheriff that he was operating the gambling casino as he had planned and, each time, gave the sheriff $500. On more than one of those occasions, the sheriff stated that it was unnecessary for Domine to pay him anything, or that Domine owed him nothing, but he accepted the money on each occasion.

### II.

Though what was done at the club was blatant sham, the government contends that it supplied the necessary effect upon commerce. The gambling equipment had been transported from Virginia. The whiskey had moved in interstate commerce for there is no licensed distillery in South Carolina. Some of the agents may have come from other states.

These, however, were not commercial transactions. The FBI transported its own gambling devices from Virginia to South

---

* The liquor at the bar was in large bottles. In South Carolina, licensed restaurants and lounges may sell alcoholic beverages for consumption on the premises, but only in mini-bottles, such as those used on the airlines. This "club" was unlicensed.

Carolina, but they were not the subjects of commercial transactions. The whiskey had moved in interstate commerce, but the FBI made no commercial use of it. It simply provided the assembled agents with free drinks. If the FBI's use of the whiskey had been reasonably necessary or appropriate, its previous movement in interstate commerce may well have supplied the jurisdictional effect upon commerce, but such an effect may not be found in pretense and contrivance. If some of the assembled agents came from other states, that was of no moment. *See Rewis v. United States*, 401 U.S. 808, 811–12, 91 S.Ct. 1056, 1059–60, 28 L.Ed.2d 493 (1971). The fact is that nothing ever happened at the club except pretense.

■ One violates the Hobbs Act, 18 U.S.C.A. § 1951, when he "obstructs, delays, or affects commerce ... [by] extortion," and, by definition, the commerce affected must be interstate commerce or commerce with or within the District of Columbia or a United States territory or possession. *Id.* at § 1951(b)(3). The jurisdictional predicate may be satisfied though the impact upon commerce is small, and it may be shown by proof of probabilities without evidence that any particular commercial movements were affected. Thus, in *United States v. Santoni*, 585 F.2d 667 (4th Cir.1978), it appeared that the FBI had set up a corporation to solicit business cleaning public buildings in Baltimore, Maryland where corruption was suspected. The cleaning corporation actually received a contract to clean a public building, and, as required by the contract, it purchased and used a cleaning compound manufactured in Pennsylvania. It also leased and brought into the state scaffolding necessary for the work. Use of the cleaning compound and the scaffolding were held enough to satisfy the commerce requirement. *Id.* at 671.

In *United States v. Spagnolo*, 546 F.2d 1117 (4th Cir.1976), we held that an effect upon commerce could be proven by proof of probabilities. There, a co-owner of a construction firm had been forced at gunpoint to sell his half interest in the business. His removal as an officer of the business was held to have had such a probable effect on interstate commerce that the jurisdictional predicate was satisfied, though there was no attempt to prove that identified shipments in commerce were affected. *Id.* at 1119.

In those cases, however, there was a strong element of reality in the commercial aspect of the activity. In *Santoni*, the contract required the purchase and use of a cleaning compound manufactured in Pennsylvania, and the necessary scaffolding was actually procured out of state. In *Spagnolo*, it was highly probable that the withdrawal of the "financial source" of the construction company would affect commerce in countless ways, for the effect of the conduct of such a business on commerce varies with the volume and nature of the construction work. There is nothing in those cases, however, to suggest that the necessary commercial connection may be shown by producing a child of fantasy.

It may be enough that the parties intended to complete a transaction which would have affected commerce, though their intention was frustrated. In *United States v. Staszcuk*, 517 F.2d 53 (7th Cir.) (*en banc*), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975), with the help of a bribe of a city councilman, a zoning change was procured to permit the erection and operation of an animal hospital. Later, after obtaining bids on the construction, the owner concluded that construction of an animal hospital was not feasible, and the land was put to a use permitted by the earlier zoning. It was held that it was enough that commerce would have been affected if the project had been carried through to conclusion as contemplated when the zoning change was effected. In that case, of course, there was nothing pretensive about the representation of the owner; he simply had underestimated his projected costs when he procured the zoning change. That case does not suggest that the requisite effect upon commerce may be found in pretense.

The Hobbs Act proscribes inchoate offenses as well as actual obstructions of commerce. When we come to the convictions on the conspiracy count, the perspective will not be the same, but we do not think the convictions of the substantive offenses may be sustained on the basis of the defendants' mistaken assumption that commerce would be affected. The defendants were the victims of false pretense, and the falsity induced the erroneous assumption. In those circumstances, what the defendants may have believed is too fragile a connection with commerce to supply the jurisdictional predicate for conviction upon the substantive charge of obstruction by extortionate means.

We are influenced by another consideration: that federal agents may not manufacture jurisdiction by contrived or pretensive means. In *United States v. Archer*, 486 F.2d 670 (2d Cir.1973), the Court of Appeals for the Second Circuit held that a violation of the Travel Act, 18 U.S.C.A. § 1952, may not be shown when the jurisdictional predicate was an unnecessary interstate telephone call placed by one of the agents. The court held that when the jurisdictional predicate is based upon acts of undercover agents, the matter should be examined with greater than ordinary care, and that contrived activity by such agents may not satisfy the requirement. *Id.* at 681–82; *c.f. United States v. Gambino*, 566 F.2d 414, 419 (2d Cir.1977).

It was wholly unnecessary for the FBI to move gambling equipment from Virginia to South Carolina, or to have its agents pretend to gamble and to purchase whiskey. We do not think the commercial predicate for federal jurisdiction can be found in such pretense on the part of federal agents. Nor do we think the conviction for the substantive offenses may be sustained on any theory of the subjective intention of the defendants or the effect of their conduct on commerce if they themselves had not been the victims of false representations and the club had been opened and operated as the undercover agent had represented.

### III.

The defendants were also convicted of conspiracy to violate the Hobbs Act, and in those convictions we perceive no infirmity. The statute not only proscribes extortion affecting commerce; it expressly extends its prohibition to one who attempts or conspires to affect commerce by extortionate means. 18 U.S.C.A. § 1951(a).

As with other conspiracies, a conviction of conspiring to obstruct commerce in violation of the Hobbs Act may be founded upon proof of an agreement to engage in conduct which would violate the statute. Though proof of some overt act in furtherance of the conspiracy may be required, proof that its purpose was accomplished is not. Unlawful conspiracies may be frustrated or aborted for a variety of reasons, including the intervention of law enforcement officials before the unlawful purpose is accomplished. Failure of its purpose, however, can never legitimate an unlawful conspiracy to commit a crime. Thus it was held in *Ladner v. United States*, 168 F.2d 771, 773 (5th Cir.1948), that the defendants were properly convicted of conspiring to violate the predecessor of the Hobbs Act though the victim refused to pay the toll. *See e.g. United States v. Jannotti*, 673 F.2d 578 (3d Cir.) (*en banc*), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), *subsequent appeal*, 729 F.2d 213 (3d Cir.1984), *cert. denied* —— U.S. ——, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984); *United States v. Brooklier*, 459 F.Supp. 476 (C.D.Cal.1978).

In *Jannotti*, it appeared that undercover agents purporting to represent a fictious Arab sheik represented to influential members of Philadelphia's city council that the sheik proposed to build a hotel of substantial size in Philadelphia, but that he would make no commitment to the project unless he had in advance satisfactory assurance that he would encounter no problem in obtaining necessary zoning variances and automobile traffic re-routing and would not be hindered or delayed by unreasonable enforcement of building codes or regulations. The councilmen gave such assur-

ances and accepted substantial payments in exchange for them.

Though the sheik and the proposed hotel were entirely fictitious, the majority of the *en banc* court held that the necessary effect upon commerce had been shown. The majority disclaimed a holding that the commercial connection could be found in the subjective intentions of the defendants that commerce be affected but, drawing on *Staszcuk*, concluded that "the defendants' conduct constituted a sufficient threat to interstate commerce so as to implicate an 'area of federal concern' sufficient to give rise to federal jurisdiction." 673 F.2d at 592.

In *Brooklier*, 459 F.Supp. 476 (C.D.Cal. 1978), it appeared that the FBI had set up a shell corporation which purported to be engaged in the exportation of pornographic films to Mexico and South America. The indictment alleged that the defendants demanded and obtained $6,500, believing the victim to be a private corporation engaged in an illegal enterprise. The indictment charged them with an attempt to violate the Hobbs Act. The court denied a motion to dismiss and, in a comprehensive opinion, held that the defendants could be convicted of the attempt charge if the allegations of the indictment were proven. Commerce would have been affected if the facts had been as the defendants believed them to have been, and the fact that an effect upon commerce was impossible in light of the true facts was no defense, since the defendants' misapprehension was a mistake of fact and not one of law. *Id.* at 479–82.

■ Upon a charge of a conspiracy or an attempt to violate the Hobbs Act, it is simply irrelevant that, because of facts unknown to the conspirators or to the actor, an actual effect upon commerce was impossible.

■ This is consistent with the general rule applicable to inchoate offenses. Though the circumstances may be misapprehended, if one "purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be," the actor is guilty of a criminal attempt. Model Penal Code,

§ 5.01(1)(a). The same principle is applicable when two or more persons conspire to engage in the conduct. The facts may be taken to be as the conspirators believed them to be.

■ In this case, there was abundant proof that Brantley and Ingram entered into a conspiratorial agreement to violate the Hobbs Act. Brantley accepted the initial extortionate payment from Ingram and subsequent ones from Domine. If the true facts had been as they believed them to have been, commerce would clearly have been affected.

This was not the case of a local enterprise that might now and then have been patronized by residents of other states. The scheme as described to the defendants was to bring down people from large northern cities for high stakes gambling. Patronage of non-residents was to be sought, while local people were to be excluded from participation. Such an operation would have been the cause of interstate travel by many, if not all, of the patrons of the establishment. *See Rewis v. United States*, 401 U.S. 808, 813–14, 91 S.Ct. 1056, 1060, 28 L.Ed.2d 493 (1971). That travel would have had an impact upon public transportation facilities and local hostelers. It would have occasioned the local consumption of food and drink, some of which would have moved in interstate commerce. The conduct in which the conspirators thought they were engaged would have had more than an adequate effect upon commerce to constitute a violation of the Hobbs Act. Brantley and Ingram were the victims of pretense in the description of the project, but that does not sanitize their purpose or their willing participation in a conspiracy to violate the Hobbs Act.

## IV.

We find no merit in any of the other contentions of the appellants.

There was insufficient evidence of entrapment to warrant an instruction on the subject, and we perceive no error in any of the rulings of the district judge during the trial or in the denial of the motion for a new trial.

## V.

For these reasons, the convictions on the substantive count are reversed while those on the conspiracy count are affirmed.

AFFIRMED IN PART; REVERSED IN PART.