**UNITED STATES of America**

v.

**Paul Wayne DERRICK.**

**Crim. No. 3:91–00091.**

United States District Court,
D. South Carolina,
Columbia Division.

Aug. 7, 1991.

E. Bart Daniel, U.S. Atty., Columbia, S.C., for the U.S.

James H. Lengel, Vinton D. Lide, Columbia, S.C., for defendant.

## ORDER

HAWKINS, Chief Judge.

This matter is before the court on the motion of the defendant for judgment of acquittal, or in the alternative, for a new trial. For the reasons set forth below, the motions of the defendant must be denied.

### I. FACTS

On May 11, 1991, a jury convicted Paul Derrick on two counts of Hobbs Act violations in connection with what has popularly become known as "Operation Lost Trust." On May 20, 1991, the defendant filed a motion for a new trial and judgment of acquittal. In his motions, the Defendant seeks a judgment of acquittal on three grounds: 1) the government failed to establish the required nexus with interstate commerce; 2) the government failed to prove extortion because the Defendant did not "induce" the payments; and 3) the government failed to prove a conspiracy because Ron Cobb was a government agent at the center of a "hub" conspiracy.

The Defendant also bases his motion for a new trial on several grounds: 1) the verdict was against the weight of the evidence; 2) misconduct affecting the jury; 3) inadequate time to prepare for trial; 4) failure to provide discovery; 5) exclusion of evidence; 6) admission of improper evidence; and 7) variance between indictment and proof.

Subsequent to the defendant's filing of his briefs, the U.S. Supreme Court handed down their opinion in *McCormick v. United States*, — U.S. ——, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991). As a result, the defendant argued at the hearing for a new trial or judgment of acquittal on the grounds that *McCormick* requires that the jury must find a *quid pro quo* to return a guilty verdict in a Hobbs Act case. Specifically, the defendant alleges that the court's charge that the jury need not find a specific *quid pro quo* was error.

### II. MOTION FOR JUDGMENT OF ACQUITTAL

██ The standard of review for a motion under Fed.R.Crim.P. 29(c) is simply that "[t]he verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Steed*, 674 F.2d 284, 286 (4th Cir.1982), *cert. denied, Steed v. United States*, 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 68.

#### A. *Interstate Commerce*

The defendant attacks the interstate element of the Hobbs Act on two levels. First, the defendant argues that there was no evidence that the actions of the defendant had any impact on interstate commerce because the bill in question was never passed and the Alpha Group was a fictitious entity.

In *United States v. Brantley*, 777 F.2d 159, 162 (4th Cir.1985), *cert. denied, Ingram v. United States*, 479 U.S. 822, 107 S.Ct. 89, 93 L.Ed.2d 42 (1986), the issue was whether the F.B.I. could manufacture jurisdiction by establishing a sham gambling den to investigate corruption against certain local officials. The court concluded that jurisdiction could not be manufactured for a substantive violation of the Hobbs Act; however, the court upheld the convictions on the conspiracy counts.

The holding of *Brantley*, 777 F.2d 159, is clear and is indisputably the law of the Fourth Circuit

> Upon a charge of conspiracy or an attempt to violate the Hobbs Act, it is simply irrelevant that, because of facts unknown to the conspirators or to the actor, an actual effect upon commerce was impossible. . . . [I]f one "purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be," the actor is guilty of a criminal attempt.

*Brantley*, 777 F.2d at 164 (citations omitted).

In addition, as the government points out in their brief, the defendant's case is directly analogous to the case of *United States v. Nelson*, 486 F.Supp. 464 (W.D.Mich. 1980). In *Nelson*, the defendant, a state legislator, was indicted for accepting a $5,000 bribe from a lobbyist for sponsoring legislation designed to legalize dog racing in Michigan. The *Nelson* holding is important because the Court held that the effects on commerce may be "merely potential." *Id.* at 471. Further, the Court held that it is the proper function of the jury to determine whether the defendant's conduct had the potential of affecting interstate commerce. *Id.* at 473.

■ In this case, Dr. Martin and Ms. Bennett testified as to the impact of the pari-mutuel bill on interstate commerce. Further, there was testimony that the defendant knew that the money was coming from Ohio based on a conversation with Robert Kohn. Thus, there was clear and convincing testimony sufficient for the jury to find that a reasonable probability existed that had the defendant's actions been successful and pari-mutuel bill had passed that interstate commerce would have been affected. *See United States v. Spagnolo*, 546 F.2d 1117 (4th Cir.1976), *cert. denied*, 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1093 (1977).

■ Second, the defendant argues that commerce must be affected "adversely" for the act to come within the parameters of the Hobbs Act. The act does not specify a positive or negative effect, it merely uses the word "affect." The defendant has cited to no case for the proposition that the "interference" with commerce must be adverse. Further, the cases indicate that the effect need not be adverse. For example, in *McCormick*, the legislation in question was bringing foreign third year medical students into West Virginia to aid impoverished families. *U.S. v. McCormick*, 896 F.2d 61, 63 (4th Cir.1990), *rev'd on other grounds*, —— U.S. ——, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991). While it can be argued that there is a negative effect in that West Virginia doctors have business taken away, it is clear from the case that there were not enough doctors in the rural areas of the state to meet the demand. Thus, the legislation had a positive effect by bringing resources into the state.

As stated above, in *Nelson*, 486 F.Supp. 464 (W.D.Mich.1980), the bill would have legalized greyhound racing. The court held that there need be no actual effect on commerce, the terms of the Act are satisfied if there is "a realistic probability that an extortionate transaction will have *some* effect on interstate commerce." *Id.* at 472 (emphasis added). Like this case and *McCormick*, the legislation would have had a positive economic impact on the local economy. These cases indicate that either an adverse or positive effect on interstate commerce will satisfy the requirements of the act. Thus, the defendant's motion must fail.

### B. *Extortion*

■ Next, the defendant argues that the government failed to prove extortion because there was no evidence that the defendant induced the payment. For this proposition they have cited to *United States v. O'Grady*, 742 F.2d 682 (2d Cir.1984) (*en banc*). Nevertheless, the Fourth Circuit has specifically held that inducement is *not* an essential element of the offense. *U.S. v. Paschall*, 772 F.2d 68, 71 (4th Cir.1985), *cert. denied, Paschall v. United States*, 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986). In *Paschall*, the Fourth Circuit specifically mentioned *O'Grady* and distinguished it. The concern in *O'Grady* was

that an official could violate the Hobbs Act by merely taking something of insignificant value. In this regard, the opinion mirrored the concerns of the Court in *McCormick* that legitimate campaign contributions should be protected. In *Paschall,* the jury had been instructed that they could convict only if the defendant had taken something of significant value, therefore, *O'Grady* was inapposite. Similarly, in this case, $1,000 can hardly be considered insignificant. Although the Supreme Court has granted certiorari in an inducement case,[1] *McCormick* specifically declined to rule on the inducement question. To this extent, *Paschall* remains the law of the Fourth Circuit and the defendant's motion must fail.

### C. *Conspiracy*

■ The defendant's final ground for judgment of acquittal is that under the *Sears* rule, *Sears v. United States,* 343 F.2d 139 (5th Cir.1965), the defendant could not be guilty of conspiracy because there was no evidence that the defendant conspired with anyone else other than Ron Cobb, the government agent at the hub of the conspiracy. Every court which has considered the issue, including the Fourth Circuit, *United States v. Chase,* 372 F.2d 453, 459 (4th Cir.1967), *cert. denied, Chase v. United States,* 387 U.S. 907, 87 S.Ct. 1688, 18 L.Ed.2d 626, has adopted the *Sears* rule. *See, e.g., United States v. Barboa,* 777 F.2d 1420, 1422 n. 1 (10th Cir.1985).

The defendant concedes that the government need only present evidence that he conspired with any of the members, or "spokes," of the hub conspiracy. There was sufficient evidence, however, for the jury to make such a finding. As the government demonstrates in their brief, there is Randy Lee's conversation with Ron Cobb concerning the defendant and the conversation which Lee had on the phone with Dr. Derrick in the presence of Cobb. There is also the conversation which Mr.

Kohn had with Mr. Lee which Kohn related to Cobb. Both of these conversations are on the April 24, 1990 tape. The key is that neither Kohn nor Lee were working for the F.B.I. at the time of these conversations. As a result, they were relaying a conversation which they had with a co-conspirator. Finally, there is the defendant's conversation with Tom Limehouse, on how he was going to characterize the money on his report, and his conversation with the F.B.I., in which he was vague and elusive about lobbyists giving cash campaign contributions, around the time that the investigation went public, all of which strongly suggest that he knew about the conspiracy and was trying to cover-up. Therefore, there appears to have been ample evidence for the jury to conclude that the defendant was aware of the conspiracy and that he had entered into an agreement, or partnership in crime, with Kohn and Lee. Based on the foregoing, the defendant's motion for acquittal should be denied.

### III. MOTION FOR A NEW TRIAL

Fed.R.Crim.P. 33 provides that the trial judge may grant a new trial when it serves the interest of justice. As stated above the defendant has set forth seven grounds which they feel warrant a new trial.

■ In general, "the remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict." *U.S. v. Indelicato,* 611 F.2d 376 (1st Cir.1979); *United States v. Page,* 828 F.2d 1476 (10th Cir.), *cert. denied,* 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987). There are numerous grounds upon which a motion for a new trial may be based. In general, errors committed at trial are judged by the harmless error standard. This applies to constitutional errors as well as errors of state law, federal statutes or rules. *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Chapman v. Califor-*

---

**1.** *United States v. Evans,* 910 F.2d 790 (11th Cir.1990), *cert. granted,* —— U.S. ——, 111 S.Ct.

2256, 114 L.Ed.2d 709 (1991).

*nia,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

■ Under the harmless error standard, the trial judge must determine if the error was harmless beyond a reasonable doubt, i.e., whether the evidence complained of might have contributed to the conviction. *Id.* In *Pope v. Illinois,* 481 U.S. 497, 502, 107 S.Ct. 1918, 1922, 95 L.Ed.2d 439 (1987), the Court elaborated on the *Rose* decision and stated that "in the absence of error that renders a trial fundamentally unfair, such as denial of the right to counsel or trial before a financially interested judge, a conviction should be affirmed '[w]here a reviewing court can find that the record developed at trial established guilt beyond a reasonable doubt....'" In addition, when the motion attacks the weight of the evidence, as do the defendant's first, fifth and sixth ground,

> the court's authority is much broader than when it is deciding a motion to acquit on the ground of insufficient evidence. In deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government. Thus, it may evaluate the credibility of the witnesses. When the evidence weighs so heavily against the verdict that it would be unjust to enter judgment, the court should grant a new trial.

*United States v. Arrington,* 757 F.2d 1484, 1485 (4th Cir.1985).

With these standards in mind, we turn to the defendant's arguments.

### A. Failure of Evidence to Support the Verdict

■ The first ground for granting a new trial is discussed above inasmuch as it deals with the sufficiency of the evidence of a conspiracy and the "inducement" element of extortion. In addition to the arguments above, however, the defendant further asserts that there was a lack of an agreement because Derrick did not vote for the bill itself, but voted in a "procedural" sense which would have allowed a vote on the actual bill if the "charge on the hill"

had been successful. As a result, the jury's finding of a conspiracy is contrary to the interests of justice.

This distinction, however, is without merit. There was clear testimony that the "core group" was going to support the pari-mutuel bill by making the procedural votes necessary to bring the pari-mutuel bill up for debate. Further, the indictment charges that Derrick promised his *support* for the bill, *Indictment* at ¶ 9, and there was substantial evidence that a procedural vote in favor of legislation was support for such legislation. The evidence discussed above does not weigh heavily against the verdict nor does it justify a new trial.

### B. Misconduct Affecting the Jury

■ The second ground for a new trial involves an alleged extra-judicial statement by Mr. Kohn that he was going to lie on the witness stand during the course of the trial. This matter was investigated during the course of the trial and was argued vigorously by counsel for the defense in their motion for a mistrial, which was denied. This court's decision on the motion for a mistrial is adequately reflected in the record of those proceedings. There remains absolutely no evidence that Mr. Kohn actually lied on the stand. Further, the defendant made a tactical decision not to cross-examine Mr. Kohn on this matter, nor did they wish to recall Mr. Kohn after this court denied their motion for a mistrial. Mr. Kohn's incentives for testifying were explored at length by both the government and the defense and the jury was specifically charged on the degree to which they should consider such testimony. Therefore, there is no evidence that Mr. Kohn's statements had any impact whatsoever on the testimony considered by the jury.

### C. Adequate Time to Prepare for Trial

### D. Failure to Provide Discovery

The defendant's allegation that he had inadequate time to prepare for trial centers on the defense's inability to review and prepare the discovery provided by the

government. Alternatively, it may be viewed as a claim that the time constraints placed on the defense rendered their counsel ineffective. The vague assertions in the defense brief confuse the distinction.

 If the argument is that they were unable to review and prepare the discovery in time, the standard of review for the court is whether the discovery material was presented in time for effective use at trial. *United States v. Smith Grading and Paving, Inc.,* 760 F.2d 527, 533 (4th Cir.1985). The defense provides no indication of how their defense could have been more effective given more preparation time. The Fourth Circuit has clearly held that " 'post-hoc assertions by counsel that given more time something might have turned up' will not suffice to demonstrate prejudice." *United States v. LaRouche,* 896 F.2d 815, 825 (4th Cir.1990), *reh. denied, en banc United States v. Larouche,* 1990 WL 4591, 1990 U.S.App. LEXIS 3286, *and cert. denied, LaRouche v. United States,* — U.S. ——, 110 S.Ct. 2621, 110 L.Ed.2d 642. Indeed, the defendant had transcripts of the tapes prepared for use at trial. As will be discussed *infra,* the problem with the defendant's transcripts was not their degree of preparedness, but their inability to authenticate them.

 The same is true if the defense is arguing that the time constraints rendered counsel's *assistance* ineffective. If this is the case, the defendant must identify specific prejudice resulting from lack of time for preparation. *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *LaRouche,* 896 F.2d at 825. The defendant has not identified any specific prejudice or errors which resulted from the lack of time for preparation nor has the defendant shown that the alleged failure to provide discovery in a "timely" manner rendered the materials use at trial ineffective. Therefore, this ground for relief is without merit.

E. *Improper Exclusion of Evidence*

The defendant bases his motion on three exclusions: 1) the Derrick newsletter, which was offered to prove that Derrick had legitimate campaign costs which would require "in kind" contributions; 2) the court's refusal to allow the jury to view the defense's transcripts simultaneously with the government's transcripts; 3) the court's refusal to admit other portions of the tapes introduced by the government.

 As for the first piece of evidence excluded, this court ruled at trial that the newsletter had no relevance to the case. The newsletter set forth numerous positions by the defendant on a variety of topics, none of which were on pari-mutuel. The defendant proffered evidence about the cost of the newsletter, but on cross-examination, the Defendant admitted that none of Cobb's payments went to the expense of the newsletter.

Ostensibly, the relevance of the newsletter was its cost so that the defense could make the link not between the particular newsletter and the payments from Cobb, but to show that the payments could have eventually gone for funding such newsletters. The defendant was allowed to comment on the cost of such a newsletter before the jury, but the particular newsletter was not relevant to any issue at trial.

 As for the tapes and the transcripts, the defendant argues that under the holding in *United States v. Mendoza,* 574 F.2d 1373, 1378 (5th Cir.1978), *cert. denied, Mendoza v. United States,* 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661, this court erred in not presenting both the defendant's and the government's transcripts simultaneously. As this court noted at trial, however, the problem with the defendant's transcripts were that they were unauthenticated. Although the defendant argues that authentication was unnecessary because only the tapes are evidence, the case law is to the contrary.

In *United States v. Campbell,* 874 F.2d 838, 850 (1st Cir.1989), the court held that " [i]t is advisable for the district court to obtain a stipulated transcript from the parties before trial or, at least before a transcript is used. Failing such a stipulation, each party should be allowed to introduce

its own transcript of the recording *provided that it is properly authenticated.' " Id. citing United States v. Rengifo,* 789 F.2d 975, 983 (1st Cir.1986). Although the Fourth Circuit has not directly addressed this point, in *United States v. Collazo,* 732 F.2d 1200, 1203–04 (4th Cir.1984), *cert. denied, Alvarez v. United States,* 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985), the court, in upholding the use of transcripts by the government, emphasized that the accuracy of the transcripts had been substantially supported by the government's witnesses.

The jury was repeatedly cautioned that the tapes themselves and not the transcripts were the evidence. In addition, the defendant was given ample opportunity to cross examine the witnesses who were parties to the conversations as to the accuracy of the government's transcripts. On at least one instance, the court gave the defendant the opportunity to question Mr. Cobb as to the veracity of their prepared transcript. Instead of authenticating their transcript, they opted to play the tape and cross-examine him as to the comments he made.

As for this court's failure to allow entire tapes into evidence, the issues at trial related to the relevancy of those portions of the tapes that the defendant wished to play. For example, at one point, Mr. Kohn was asked about a discrepancy in a portion of a tape which the government did not play. The defendant proffered their transcript for the portion of the tape which had not been played. After the proffer, which involved Derrick's association with the Rules Committee, the defense decided that they did not need to play the tape. Rather, they used their transcript to refresh Kohn's recollection and explored the possible discrepancies in his testimony through cross-examination. Thus, this court's rulings at trial were not an abuse of discretion and the defendant's motion must fail.

### F. *Admission of Improper Evidence*

The focus of this ground for a new trial is that evidence of a trip which the defendant took to Monterey, California was admitted over the defendant's objection. The defendant's primary assertion is that this evidence is more prejudicial than probative.

In the Fourth Circuit, 404(b) evidence is admissible if it is relevant to an issue other than character, necessary, and reliable. *United States v. Rawle,* 845 F.2d 1244, 1247 (4th Cir.1988). Further, its probative value must outweigh its prejudicial value. *Id.*

In the context of entrapment, the Fourth Circuit has said, in an unpublished opinion, that "it is clear that the government is permitted broad latitude under Rule 404(b) to introduce evidence of relevant prior acts once defendant has raised a claim of entrapment thereby putting into issue his predisposition to commit the crimes with which he is charged." *United States v. Abulhawa,* 833 F.2d 1006 (4th Cir.1987) (unpublished opinion). While we are aware of the precedential value of unpublished opinions, this view is also followed in a majority of circuits. *United States v. Simtob,* 901 F.2d 799, 807 (9th Cir.1990); *United States v. Roper,* 874 F.2d 782, 788 (11th Cir.1989), *cert. denied, Roper v. United States,* 493 U.S. 867, 110 S.Ct. 189, 107 L.Ed.2d 144 (1989); *United States v. York,* 830 F.2d 885 (8th Cir.1987), *cert. denied, York v. United States,* 484 U.S. 1074, 108 S.Ct. 1047, 98 L.Ed.2d 1010 (1988); *United States v. Parrish,* 736 F.2d 152, 156 (5th Cir.1984); *United States v. Ward,* 793 F.2d 551, 555 (3d Cir.1986); *United States v. Mazza,* 792 F.2d 1210, 1223 (1st Cir.1986), *cert. denied, Mazza v. United States,* 479 U.S. 1086, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987).

Much of the justification for these holdings is derived from the language in *Sorrells v. United States,* 287 U.S. 435, 451, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932) that a defendant who has raised the entrapment defense "cannot complain of an appropriate and searching inquiry into his own conduct and predisposition ..." Such is the case here.

The trip to Monterey was relevant to a material issue other than character, namely the defendant's willingness to ac-

cept gratuities from lobbyists, based solely on his office, without reporting them as he was required.[2] The government bears the burden of showing predisposition once the defendant raises the defense of entrapment, *United States v. Hunt*, 749 F.2d 1078, 1084–85 (4th Cir.1984), *cert. denied, Hunt v. United States*, 472 U.S. 1018, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985), and the evidence of the trip to Monterey was certainly relevant, necessary and reliable regarding this inquiry. Therefore, this ground for a new trial is without merit.

### G. *Variance Between Indictment and Proof*

■ The defendant's final ground for a new trial is a reassertion that the government has manufactured federal jurisdiction, which the defendant inexplicably asserts is contrary to the "essence" of *Brantley*, 777 F.2d 159. As a result, the defendant argues that although the government charged attempted extortion, their proof at trial centered on actual extortion.

First, there is ample authority for the proposition that success is never a viable defense to a charge of attempt. *See, e.g., United States v. York*, 578 F.2d 1036, 1039 (5th Cir.1978). As the court stated in *York*

> To compel acquittal of an attempt because the completed offense was proved would result in the "anomalous situation of a defendant going free 'not because he was innocent, but for the very strange reason that he was too guilty.'" (Footnote omitted) *United States v. Fleming*, supra, 215 A.2d [839] at 840–841 [(D.C.App.1966)]. Moreover, requiring the government to prove failure as an element of attempt would lead to the anomalous result that, if there were a reasonable doubt concerning whether or not a crime had been completed, a jury could find the defendant guilty neither of a completed offense nor of an attempt. Therefore, every court, not otherwise bound by statute that has considered the matter in recent years has refused to

require that a defendant be acquitted of an attempt because he was guilty of completing what he set out to do.

*Id.* at 1039.

Second, as stated above, the holding of *Brantley* is clear and is indisputably the law of the Fourth Circuit

> Upon a charge of conspiracy or an attempt to violate the Hobbs Act, it is simply irrelevant that, because of facts unknown to the conspirators or to the actor, an actual effect upon commerce was impossible.... [I]f one "purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be," the actor is guilty of a criminal attempt.

*Brantley*, 777 F.2d at 164 (citations omitted).

Therefore, the defendant's seventh ground for a new trial is without merit.

## IV. GROUNDS FOR RELIEF UNDER McCORMICK

### A. *Judgment of Acquittal*

Based on the Supreme Court's decision in *McCormick v. United States*, — U.S. —, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991), which was made subsequent to the trial of this case, the defendant argues that he is entitled to judgment of acquittal or, in the alternative, a new trial. Both grounds are without merit.

■ As for a judgment of acquittal, the defendant argues that there was insufficient evidence for the jury to find that a *quid pro quo* existed or that the defendant induced Ron Cobb to pay him the money. The inducement issue has been addressed above. Taking the evidence in the light most favorable to the government, *United States v. Saunders*, 886 F.2d 56, 60 (4th Cir.1989), there was sufficient evidence for the jury to find that a *quid pro quo* existed.

The most damaging pieces of evidence are the video and audio tapes. In one tape, there is a conversation between Mr. Kohn

---

**2.** It should be noted, however, that *McCormick* specifically refused to address the legality of accepting such gifts in the context of the Hobbs Act.

and Mr. Cobb in which Mr. Kohn relates how he has explained the payoff to the defendant. Mr. Kohn tells Cobb that he explained to the defendant that "[i]ts five hundred for a walk and a thousand for a firm commitment." This tape was recorded on April 24, 1990 before Mr. Kohn began working for the government. The very next day, just prior to the effort to get pari-mutuel on the floor for debate, the defendant states to Mr. Cobb that he understands that Cobb needs "either me voting or walking, huh?" On the same day, there is a tape of a conversation between Ron Cobb and Randy Lee, another lobbyist, in which Randy Lee relates a conversation between he and the defendant in which the defendant had inquired whether Cobb has as much money as he says he does to "pay these guys on this thing." The June 6, 1990 tape shows the defendant accepting the money from Ron Cobb.

The defendant's various attempts to determine how to characterize the money are also damaging evidence. The F.B.I. agent who interviewed Dr. Derrick testified that when asked if he was aware of any lobbyists who had offered cash payments to legislators, the defendant responded in the negative. When asked if he had received any cash payments from a lobbyist, the agent testified that the defendant responded that he may have, but not in the last year and if he had, it would have been several years ago and would have been properly documented. It was not until after the visit by the F.B.I. that the defendant filed an amended campaign disclosure form acknowledging the monies, which he characterized as an "in-kind" contribution. Yet, there was ample testimony that cash is never an "in-kind" contribution.

Finally, there is the testimony of Tom Limehouse. Mr. Limehouse testified regarding the numerous telephone calls between the defendant, himself and the other members of the core group just after the investigation went public and the defendant's concerns about whether to acknowledge the money form Ron Cobb and, if he acknowledged it, how to characterize it. Therefore, when viewed in the light most favorable to the government, *Saunders*, 886 F.2d at 60, there was ample evidence for the jury to find that defendant agreed to support pari-mutuel betting in exchange for money and that a *quid pro quo* existed.

### B. *New Trial*

The defendant's final ground for a new trial is that the court erroneously instructed the jury that there need be no specific *quid pro quo* to establish extortion under color of official right as required under the Supreme Court's recent ruling in *McCormick*. First, we must determine the appropriate standard of review.

#### 1. *The standard of review*

The decision before us is whether to apply the "harmless error" or "clear" error analysis. As will be set forth more fully below, the defendant's motion must fail under either standard.

 The issue of an allegedly erroneous jury instruction may not be raised if the defendant did not object or propose alternative instructions at trial, *United States v. Bryant*, 612 F.2d 799, 803 (4th Cir.1979), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1855, 64 L.Ed.2d 274 (1980), unless the court's failure to properly instruct was clear error within the meaning of Fed. R.Crim.P. 52(b). *United States v. McCaskill*, 676 F.2d 995, 1001 (4th Cir.), *cert. denied*, 459 U.S. 1018, 103 S.Ct. 381, 74 L.Ed.2d 513 (1982).[3]

---

3. The confusion as to the appropriate standard arises from the Supreme Court's decision in *McCormick*. Although McCormick had not objected to the charge at trial, both the Appellate Court and the Supreme Court addressed the issue of the erroneous charge. Thus, the majority seemed to ignore the different standards of review in reaching their decision. *McCormick*, 111 S.Ct. 1807, 1820–21, 1825 (Stevens, J., dissenting).

Despite the majority's diffidence over Fed. R.Crim.P. 30 in *McCormick*, we cannot accept the proposition that the Supreme Court has unilaterally disposed of Fed.R.Crim.P. 30, especially in a case in which the defendant himself has requested the erroneous charge. Rather, the reason that the majority in McCormick addressed the issue of the charge was apparently that McCormick had raised the issue on appeal and the Appellate opinion had addressed his

In this case, no specific objection to the *quid pro quo* charge was raised at trial. As a result, we believe that this motion should be analyzed using the clear or plain error standard. To the extent that the defendant's numerous objections regarding inducement may be regarded as requesting a specific *quid pro quo* charge, however, we have also analyzed the motion using the harmless error standard.

In determining if the charge was clear, or plain, error the court must determine if the error seriously affects the "fairness, integrity, or public reputation of the judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936). The courts should exercise this discretion only in exceptional circumstances, *id.*, and the weight of the evidence against the defendant is relevant to the court's inquiry. *United States v. Giese*, 597 F.2d 1170, 1199 (9th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). As the Fourth Circuit stated in *McCaskill*, clear error can only be found when

> after reviewing the entire record, it can be said the claimed error is a *'fundamental* error something so basic, so prejudicial, so lacking in its elements that justice cannot have been done,' or 'where [the error] is grave error which amounts to a denial of a fundamental right of the accused,' or the error has 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' or where error is such as to 'seriously affect the fairness, integrity or public reputation of judicial proceedings' or where it can be fairly

said 'the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.'

*McCaskill,* 676 F.2d at 1002 (emphasis in original) (citations omitted).

Under the harmless error standard, the trial judge must determine if the error, considering the record as a whole, was harmless beyond a reasonable doubt. *Rose v. Clark*, 478 U.S. 570, 583, 106 S.Ct. 3101, 3109, 92 L.Ed.2d 460 (1986).[4] In *Pope v. Illinois*, 481 U.S. 497, 502, 107 S.Ct. 1918, 1921, 95 L.Ed.2d 439 (1987), the Court elaborated on the *Rose* decision and stated that "in the absence of error that renders a trial fundamentally unfair, such as denial of the right to counsel or trial before a financially interested judge, a conviction should be affirmed '[w]here a reviewing court can find that the record developed at trial established guilt beyond a reasonable doubt....' "

*Pope* is directly on point because the issue was whether the trial court's misdescription of an element of the offense justified a new trial and the Supreme Court held that it did not. The inquiry is whether based on the facts found by the jury, it is clear beyond a reasonable doubt the jury's verdict would have been the same even if they had never heard the impermissible instruction. *Id.* at 503, n. 6, 107 S.Ct. at 1922, n. 6. Stated another way, an error is harmless if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828; *Yates v. Evatt*, —— U.S. ——, 111 S.Ct. 1884, 1892, 114 L.Ed.2d 432 (1991).

---

assertion in its opinion even though he had not raised the objection at trial. Since the issue had been addressed, rightly or wrongly, at the appellate court level, the majority felt that it was proper for the Supreme Court to address the issue as well. *McCormick*, 111 S.Ct. at 1815, n. 9.

4. Justice Scalia wrote a concurrence in *Carella v. California*, 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989) which, it has been argued, lessens the standard set forth in *Rose.* This argument has been rejected by the Fourth Circuit, *Waye v. Townley*, 884 F.2d 762, 764 (4th Cir.1989). Further, Justice Scalia's concurrence addresses the harmless error standard only as it

is applied in assessing an improper mandatory conclusive presumption charge. *Carella,* 109 S.Ct. at 2421. Thus, Justice Scalia's concurrence is inapplicable to a case such as this which involves a misstatement as to an element of the offense. This case presents the usual case of harmlessness which requires consideration of the record as a whole. *Id.* Similarly, the subsequent refinement of Justice Scalia's concurrence in *Yates v. Evatt*, —— U.S. ——, 111 S.Ct. 1884, 1892 n. 8, 114 L.Ed.2d 432 (1991) is inapplicable, although those portions of the opinion which address the usual harmlessness analysis are instructive.

As will be developed more fully below and viewing the record as a whole, the jury's verdict indicates that they found, as a factual matter, that the money was not a campaign contribution and that a *quid pro quo* existed.

### 2. *McCormick*

The primary concern expressed by the majority opinion in *McCormick* is the breadth of the seven factor test to distinguish legitimate from illegitimate campaign contributions as well as the "voluntariness" of such contributions. The majority was clearly concerned that the Appellate Court's formulation for distinguishing contributions was too general and could encompass numerous legitimate political contributions. *McCormick*, 111 S.Ct. at 1816.

Further, the majority expressed a concern that the instructions were susceptible to an interpretation under which a contribution was involuntary if it was made with *any* expectation of benefit. The Supreme Court recognized, and common sense dictates, that most if not all campaign contributions are given with a general expectation of benefit. As a result, the most significant aspect of the opinion is that a finding of a specific *quid pro quo*, rather than a general expectation of benefit, is necessary for a violation of the Hobbs Act when the defendant claims that the money was a campaign contribution.

> Political contributions are of course vulnerable if induced by use of force, violence or fear. The receipt of such contributions is also vulnerable under the Act as having been taken under color of official right, but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking. This is the receipt of money by an elected official under color of official right within the meaning of the Hobbs Act.

This formulation defines the forbidden zone of conduct with sufficient clarity. *McCormick*, 111 S.Ct. at 1816.

This is the extent of the guidance which the majority gives us on the *quid pro quo* that is necessary for a violation of the Hobbs Act. The holding of *McCormick* is certainly limited. The opinion does not address any jurisdictional issues, although it is apparently assumed that McCormick's actions would have affected, or did affect, interstate commerce, nor the necessity of an "inducement" by the official, nor does it address the requirements of the Hobbs Act vis a vis travel, meals, gifts or other articles of value. *Id.* at 1817, n. 10.

At least the following are clear from the *McCormick* decision:

1) The intent of the parties is a relevant consideration.

2) A *quid pro quo* instruction is required when the defendant alleges that the monies were campaign contributions. *Id.* at 1817, n. 10.

### 3. *Analysis*

■ Under either the clear error or harmless error standard, the defendant's motions must fail. Under the clear or plain error standard, we do not feel that the charge taken in the context of the entire charge and evidence as a whole amounts to a miscarriage of justice. Consistent with *McCaskill*, 676 F.2d at 1002, the defendant received a fair trial with the assistance of very capable counsel and, as set forth below, we cannot say that the instruction had a probable impact on the jury's verdict. The findings of the jury regarding the legitimacy of the monies given to the defendant makes it clear that the charge had no impact on the jury's verdict.

Two questions aid in the harmless error analysis. First, is the evidence sufficient to establish that the monies could have been considered campaign contributions, which would justify a *quid pro quo* charge? Second, if a *quid pro quo* charge should have been given, does the jury charge, taken as a whole and when coupled with the verdict, allow the court to find beyond a reasonable doubt that the jury found that the defendant offered his support in exchange for the payments, i.e., that a *quid pro quo* existed and the errone-

ous charge was harmless? The jury's findings on intent are clearly important in this regard.

a. *Is the evidence sufficient to establish that the monies could have been considered campaign contributions, which would justify a quid pro quo charge?*

The *McCormick* decision is clear that the defendant must claim that the money was a campaign contribution to receive a *quid pro quo* charge. 111 S.Ct. at 1817, n. 10. Otherwise, if the money is not a campaign contribution, the money is not due and owing to the official, which violates the statute. *United States v. Paschall*, 772 F.2d 68, 73 (4th Cir.1985), *cert. denied*, 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986).

The holding is also clear that even political contributions are vulnerable under the act if the payments are made in return for an explicit promise or undertaking. *Id.* The implication is that less legitimate forms of payment are certainly vulnerable under the act which may not require proof of a *quid pro quo* since the danger of convicting a defendant of an otherwise legal activity is not present. Thus, the inquiry becomes whether or not there was sufficient evidence to establish that the monies were campaign contributions. In addition to the defendant's own evidence, the government's evidence can raise a defense or a reasonable doubt sufficient to warrant an instruction. *United States v. Hicks*, 748 F.2d 854, 857 (4th Cir.1984). In the case of Dr. Derrick, the defense certainly produced sufficient evidence to justify a *quid pro quo* charge.

b. *If a quid pro quo charge should have been given, does the jury charge, taken as a whole and when coupled with the verdict, allow the court to find beyond a reasonable doubt that the jury found that the defendant offered his support in exchange for the payments?*

First, we must examine the charge as a whole. *United States v. Silva*, 745 F.2d 840, 852 (4th Cir.1984); *United States*

*v. Park*, 421 U.S. 658, 671, 95 S.Ct. 1903, 1911, 44 L.Ed.2d 489 (1975). The instructions make it clear that the jury had to find that the monies were *not* campaign contributions to find the defendant guilty:

Under our system of government, the law authorizes elected officials to solicit campaign contributions. The Hobbs Act, under which the Defendant has been charged, does not punish an elected official for accepting campaign contributions. *If you find that the defendant accepted the money from Ron Cobb reasonably believing that the money was a legitimate campaign contribution, you must acquit the Defendant on all counts in the indictment.* (emphasis added)

Charge at p. 32, 1. 17.

It is a well established presumption that "jurors are reasonable and generally follow the instructions they are given," and there are no indications to the contrary in this case. *Evatt*, 111 S.Ct. at 1893. Thus, the jury had to consider evidence as to whether the monies were or were not campaign contributions. Admittedly, "legitimate" is not defined with any precision; yet, the problem in *McCormick* was that the court had attempted to define "legitimate" with too much precision. If the definition of "reasonable doubt" is left to the collective and individual wisdom of the jury, *United States v. Headspeth*, 852 F.2d 753, 755 (4th Cir.1988), then certainly they are capable of differentiating between a "legitimate" and "illegitimate" campaign contribution. As the *McCormick* case demonstrated, too precise a definition can lead to unnecessary confusion.

If the monies were not campaign contributions, and the jury clearly indicated they were not, then the money was not due and owing the defendant and the receipt of money was in violation of the Hobbs Act. *Paschall*, 772 F.2d at 73. Further, since the jury found that the monies were not legitimate campaign contributions, the finding of a *quid pro quo* was not required, *McCormick*, 111 S.Ct. at 1817, and the inclusion of the charge in this case was harmless error. Finally, the charge given in this case gave the defendant a greater

chance for acquittal than the charge suggested by the *McCormick* case because this charge mandated a not guilty verdict if the jury found that the monies were campaign contributions whereas even *McCormick* requires a guilty verdict if a campaign contribution is associated with a specific *quid pro quo.*

The record is also sufficient to establish guilt beyond a reasonable doubt even if a *quid pro quo* is required. Aside from the defendant's specious argument that a procedural vote in favor of a bill is not a vote in support of a bill, it is not contested that the defendant supported pari-mutuel, or that Ron Cobb paid them money, the only dispute is the defendant's contention, or intent, that the money was a campaign contribution. The charge specifically stated that "to find Paul Wayne Derrick guilty of attempt to commit extortion under color of official right, you must be convinced beyond a reasonable doubt that at the time payments were made to the defendant, he was aware that the payments were intended to influence his official conduct." Charge at 19, 1. 3. If the payments were made with this awareness and the intent to support pari-mutuel, as the jury clearly found, then a *quid pro quo* was established. In contract terms, there is an offer, an acceptance and consideration.

Viewing the record as a whole, as stated above and with particular emphasis on the video and audio tapes, there was substantial evidence to support the jury's finding of a *quid pro quo.*

In conclusion, the defendant's motion should be denied. First, to the extent that he has not preserved his right to appeal, the charge is not plain error. Consistent with *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), the defendant received a fair trial with the assistance of very capable counsel. The findings of the jury regarding the legitimacy of the monies given to the defendant make it clear that the charge had no impact on the jury's verdict.

Second, assuming that a harmless error standard applies, the inclusion of the charge was harmless inasmuch as the jury clearly found that the monies were not legitimate campaign contributions, which obviates the requirement of a specific *quid pro quo.* *McCormick,* 111 S.Ct. at 1817. In addition, the record establishes guilt beyond a reasonable doubt even if a specific *quid pro quo* charge was required. As stated above, the jury clearly found that the defendant accepted the monies knowing that they were intended to influence his official conduct and that they were not campaign contributions. Therefore, the inclusion of the erroneous charge was harmless.

Pursuant to *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) and *Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987), we believe that the record establishes guilt beyond a reasonable doubt, that the erroneous charge had no impact on the verdict and that the jury's verdict should be affirmed. Therefore, based on the foregoing it is

ORDERED, that the defendant's motions for judgment of acquittal, or in the alternative for a new trial be, and the the same are hereby, denied.

AND IT IS SO ORDERED.